Allan Urgent
Assistant United States Attorney
970 Broad Street, 7th Floor
Newark, NJ 07102
973-297-2019

Brian G. Donohue
Senior Attorney
Patrick Bryan
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
202-514-5413

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>Plaintiff, )<br><br>v. )<br><br>PAULSBORO REFINING COMPANY LLC, )<br><br>Defendant. ) | Civil Action No.  2:17-cv-2662 |

## COMPLAINT

The United States of America, by authority of the Attorney General, acting at the

request of the Administrator of the U.S. Environmental Protection Agency (EPA), brings this

complaint and alleges as follows:

## NATURE OF ACTION

1. In this civil action under Section 113 of the Clean Air Act (CAA or the Act),

42 U.S.C. § 7413, the United States seeks civil penalties and injunctive relief against Paulsboro

Refining Company LLC, (PRC) for violations of: 1) the duty to operate its petroleum refinery facility in Paulsboro, New Jersey (Facility) in a manner consistent with the good air pollution control practices provisions of both the new source performance standards (NSPS) and national emission standards for hazardous air pollutants (NESHAP) of the Act at Sections 111, 112 and 114, 42 U.S.C. §§ 7411, 7412 and 7414, and the regulations promulgated thereunder; and 2) PRC's CAA Title V Operating Permit (Operating Permit).

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1345 and 1355, and Section 113(b) of the Act, 42 U.S.C. § 7413(b).

3.      This Court has personal jurisdiction over PRC, a corporation doing business in the State of New Jersey.  42 U.S.C. § 7413(b).

4.      Venue lies in the District of New Jersey because PRC is found in and conducts business in this District and because the alleged violations occurred within this District. 42 U.S.C. § 7413(b); 28 U.S.C. §§ 1391(b) and (c), and 1395(a).

## NOTICE

5.      As required by Section 113(b) of the CAA, 42 U.S.C. § 7413(b), the United States has notified the appropriate state air pollution control agency in the State of New Jersey of the commencement of this Action.

## AUTHORITY

6.      The United States Department of Justice has authority to bring this action on behalf of the Administrator of EPA under 28 U.S.C. §§ 516 and 519 and Section 305(a) of the CAA, 42 U.S.C. § 7605(a).

**DEFENDANT**

7.    PRC is a Delaware corporation doing business in Paulsboro, New Jersey.

8.    Upon information and belief, PRC was incorporated in Delaware under the name of Valero Refining Company – New Jersey (VRC-NJ), which changed its name to PRC in December 2010.  Hereinafter, PRC and VRC-NJ will together be referred to as PRC.

9.    PRC has owned/operated the Facility at all relevant times.

10.    PRC is a "person" within the meaning of Section 302(e) of the Act, 42 U.S.C. § 7602(e).

**STATUTORY AND REGULATORY BACKGROUND**

11.    The Clean Air Act establishes a regulatory scheme designed to protect and enhance the quality of the nation's air in order to promote the public health and welfare and the productive capacity of its population.  42 U.S.C. § 7401(b)(1).  The CAA regulations cited below are the regulations as promulgated at the time the violations alleged in this Complaint occurred.

A.    **National Emission Standards for Hazardous Air Pollutants**

1.    ***General Statutory Provisions***

12.    Section 112(b) of the CAA, 42 U.S.C. § 7412(b), originally established a list of 189 hazardous air pollutants ("HAPs") believed to cause adverse health or environmental effects.

13.    Section 112(c) of the CAA, 42 U.S.C. § 7412(c), directed EPA to publish a list of all categories and subcategories of, *inter alia*, major sources of HAPs.

14.    A "category" of sources is a group of sources having some common features suggesting that they should be regulated in the same way and on the same schedule.

57 F.R. 31576, 31578 (July 16, 1992).  A single stationary source can be comprised of multiple source categories.  Id.

15.      "Major source" is defined as any stationary source or group of stationary sources located within a contiguous area and under common control that emits or has the potential to emit, considering controls, in the aggregate, 10 tons per year or more of any HAP or 25 tons per year or more of any combination of HAPs.  42 U.S.C. § 7412(a)(1).

16.      "Stationary source" is defined as any building, structure, facility, or installation which emits or may emit any air pollutant.  42 U.S.C. §§ 7411(a)(3) and 7412(a)(3) (stating that "stationary source" under Section 112(a) has the same meaning as under Section 111(a)(3) of the CAA, 42 U.S.C. § 7411(a)(3)).

17.      Section 112(d)(1) of the CAA, 42 U.S.C. § 7412(d)(1), directs EPA to promulgate regulations establishing emission standards for each category or subcategory of, *inter alia*, major sources of HAPs listed under Section 112(c).  These emission standards require the maximum degree of reduction in emissions of HAPs that the Administrator, taking certain factors into consideration, determines is achievable for new or existing sources in the category or subcategory to which the emission standard applies.  42 U.S.C. § 7412(d)(2).

18.      Where it is not feasible to prescribe or enforce an emission standard for control of a HAP, Section 112(h) of the CAA, 42 U.S.C. § 7412(h), authorizes EPA to promulgate "design, equipment, work practice, or operational" standards, which are to be treated as emission standards.

19.      The emission standards under Section 112 of the CAA, 42 U.S.C. § 7412, are known as the National Emission Standards for Hazardous Air Pollutants (NESHAPs) for

Source Categories, otherwise known as the maximum achievable control technology (MACT) standards.  These emission standards are found at 40 C.F.R. Part 63.

20.     After the effective date of any emission standard, limitation or regulation promulgated pursuant to Section 112 of the CAA, no person may operate a source in violation of such standard, limitation, or regulation.  42 U.S.C. § 7412(i)(3).

2.     *MACT Regulatory Requirements – MACT General Provisions*

21.     Pursuant to Sections 112 and 114 of the Act, EPA promulgated 40 C.F.R. Part 63, Subpart A, §§ 63.1 through 63.16 (MACT General Provisions).

22.     40 C.F.R. § 63.1(a)(4)(i) provides that each source category standard in Part 63 must identify explicitly whether a provision in the MACT General Provisions is included in such relevant source category standard.

23.     40 C.F.R. § 63.1(a)(4)(ii) provides that if a relevant Part 63 source category standard incorporates the requirements of a 40 C.F.R. Part 60, Part 61 or other Part 63 standard, the relevant Part 63 source category standard must identify explicitly the applicability of each corresponding Part 60, Part 61, or other Part 63 Subpart A (General) provision.

24.     40 C.F.R. § 63.2 defines "existing source" as any affected source that is not a new source.

25.     40 C.F.R. § 63.2 defines "owner or operator" as any person who owns, leases, operates, controls, or supervises a stationary source.

26.     40 C.F.R. § 63.2 defines "stationary source" as any building, structure, facility, or installation which emits or may emit any air pollutant.

27.     40 C.F.R. § 63.6(e)(1)(i) provides, among other things, that at all times, including periods of startup, shutdown, or malfunction, the owner or operator must operate and

maintain any affected source, including associated air pollution control equipment and monitoring equipment, in a manner consistent with safety and good air pollution control practices for minimizing emissions.  Determination of whether such operation and maintenance procedures are being used will be based on information available to EPA which may include, but is not limited to, monitoring results, review of operation and maintenance procedures, review of operation and maintenance records, and inspection of the source.

28.     40 C.F.R. § 63.2 defines "affected source" as the collection of equipment, activities, or both, within a single contiguous area under common control that is included in a source category for which a relevant standard is established under Section 112 of the Act, 42 U.S.C. §7412.

29.     40 C.F.R. § 63.11(b)(1) provides that owners or operators using flares to comply with Part 63 must, among other things, monitor such flares to ensure that they are operated and maintained in conformance with their designs.

### 3.   *Applicable MACT Regulatory Requirements -- Petroleum Refinery MACT*

30.     Pursuant to Sections 112 and 114 of the Act, 42 U.S.C. §§ 7412 and 7414, EPA promulgated a NESHAP for petroleum refineries at 40 C.F.R. Part 63, Subpart CC, §§ 63.640 through 63.655 (Refinery MACT).  Amendments to the Refinery MACT were promulgated on December 1, 2015.  *See* 80 Fed. Reg. 75178.

31.     Table 6 of the Refinery MACT lists the MACT General Provisions that are included in the Refinery MACT, including the requirements in 40 C.F.R. §§ 63.6(e)(1)(i) and 63.11(b)(1), cited in Paragraphs 27 and 29 above.

32.     40 C.F.R. § 63.640(a) provides that the Refinery MACT applies to, among other things, petroleum refining process units that are located at a plant site that is a major

source as defined in Section 112(a) of the Act, and that emit, or have equipment containing or

contacting, one or more of the HAPs listed in Table 1 of the Refinery MACT.

33.    40 C.F.R. § 63.640(c) provides that, for purposes of the Refinery MACT,

the affected source comprises all emission points, in combination, listed in 40 C.F.R. §

63.640(c)(1) through (c)(8), which are located at a single refinery plant site, including, among

other things, all miscellaneous process vents from petroleum refining process units meeting the

criteria in 40 C.F.R. § 63.640(a).

34.    40 C.F.R. § 63.641 defines "petroleum refining process unit" as a process

unit primarily engaged in petroleum refining as defined in the Standard Industrial Classification

code for petroleum refining (2911), and used primarily for, among other things, producing

transportation fuels (such as gasoline, diesel fuels, and jet fuels), heating fuels (such as

kerosene, fuel gas distillate, and fuel oils), or lubricants.

35.    40 C.F.R. § 63.641 defines "plant site" as all contiguous or adjoining

property that is under common control including properties that are separated only by a road or

other public right-of-way.

36.    40 C.F.R. § 63.641 defines "process unit" as the equipment assembled and

connected by pipes or ducts to process raw and/or intermediate materials and to manufacture an

intended product.

37.    40 C.F.R. § 63.641 defines "affected source" as the collection of emission

points to which the Refinery MACT applies as determined by the criteria in 40 C.F.R. §

63.640.

38.    40 C.F.R. § 63.641 defines "emission point" as, among other things, an

individual miscellaneous process vent associated with a petroleum refining process unit.

39.     40 C.F.R. § 63.641 defines a "control device" as, among other things, flares.

40.     40 C.F.R. § 63.643(a) provides that the owner or operator of a Group 1 miscellaneous process vent shall either reduce emissions of organic HAPs using a flare that meets the requirements of 40 C.F.R. § 63.11(b) of the MACT General Provisions, or reduce emissions of organic HAPs, using a control device, by 98 weight-percent or to a concentration of 20 parts per million by volume, on a dry basis, corrected to 3 percent oxygen, whichever is less stringent.

41.     40 C.F.R. § 63.641 defines "miscellaneous process vent" as a gas stream containing greater than 20 parts per million by volume organic HAP that is continuously or periodically discharged during normal operation of a petroleum refining process unit meeting criteria specified in 40 C.F.R. § 63.640(a). Miscellaneous process vents include gas streams that are discharged directly to the atmosphere, gas streams that are routed to a control device prior to discharge to the atmosphere, or gas streams that are diverted through a product recovery device prior to control or discharge to the atmosphere.

42.     40 C.F.R. § 63.641 defines "Group 1 miscellaneous process vent" as a miscellaneous process vent for which the total organic HAP concentration is greater than or equal to 20 parts per million by volume, and the total volatile organic compound emissions are greater than or equal to 33 kilograms per day for existing sources at the outlet of the final recovery device (if any) and prior to any control device and prior to discharge to the atmosphere.

43.     40 C.F.R. § 63.648(a) provides that each owner or operator of an existing source subject to the Refinery MACT comply with the equipment leak provisions of 40 C.F.R.

Part 60, Subpart VV (NSPS Subpart VV) and 40 C.F.R. § 63.648(b), except as otherwise

provided.  For purposes of compliance with 40 C.F.R. § 63.648, the provisions of Subpart VV

apply to equipment in organic HAP service.

44.     40 C.F.R. § 63.481 defines "equipment" as each pump, compressor,

pressure relief device, sampling connection system, open-ended valve or line, valve, and flange

or other connector in VOC service and any devices or systems required by NSPS Subpart VV.

45.     40 C.F.R. § 63.641 defines, equipment "in organic HAP service" as a

piece of equipment that either contains or contacts a fluid (liquid or gas) that is at least 5% by

weight of total organic HAPs.

46.     40 C.F.R. § 60.482-10(a) of Subpart VV provides that owners or operators

of, among other things, control devices (such as flares pursuant to 40 C.F.R.

§ 60.481), shall comply with the provisions of 40 C.F.R. § 60.482-10.

47.     40 C.F.R. § 60.482-10(d) provides that flares used to comply with Subpart

VV shall comply with the requirements of 40 C.F.R. § 60.18.

48.     40 C.F.R. §§ 60.18(d) and 60.482-10(e) provide that owners or operators

of flares used to comply with NSPS Subpart VV shall monitor such control devices to ensure

they are operated and maintained in conformance with their designs.

**B.     New Source Performance Standards**

*1. General*

49.     Section 111(b)(1)(A) of the CAA, 42 U.S.C. § 7411(b)(1)(A), requires

EPA to publish and periodically revise a list of categories of stationary sources including those

categories that, in EPA's judgment, cause or contribute significantly to air pollution which may

reasonably be anticipated to endanger public health or welfare.

50.     EPA identified petroleum refineries as one category of stationary sources that cause, or contribute significantly to, air pollution that may reasonably be anticipated to endanger public health or welfare.

51.     Once a category is included on the list, Section 111(b)(1)(B) of the CAA, 42 U.S.C. § 7411(b)(1)(B), requires EPA to promulgate a federal standard of performance for new sources within the category, known as a New Source Performance Standard (NSPS).

52.     Section 111(e) of the CAA, 42 U.S.C. § 7411(e), prohibits an owner or operator of a new source from operating that source in violation of an NSPS after the effective date of the NSPS applicable to such source.

53.     EPA promulgated New Source Performance Standards for petroleum refineries at 40 C.F.R. Part 60, Subpart J, §§ 60.100-60.109 (Subpart J).

54.     "Petroleum refinery" is defined as a facility engaged in producing gasoline, kerosene, distillate fuel oils, residual fuel oils, lubricants, or other products through distillation of petroleum or through redistillation, cracking or reforming of unfinished petroleum derivatives. 40 C.F.R. § 60.101.

55.     "Owner or operator" is defined as any person who owns, leases, operates, controls, or supervises an affected facility or a stationary source of which an affected facility is a part. 40 C.F.R. § 60.2.

56.     "New source" is defined as any stationary source, the construction or modification of which is commenced after the publication of the NSPS regulations or proposed NSPS regulations applicable to such source. 42 U.S.C. § 7411(a)(2).

57.     "Stationary source" is defined as a building, structure, facility, or installation which emits or may emit any air pollutant. 42 U.S.C. § 7411(a)(3).

### 2. *Subpart A*

58.     In furtherance of Section 111(b)(1)(B) of the CAA, 42 U.S.C.

§ 7411(b)(1)(B), EPA promulgated regulations that contain general provisions applicable to all

NSPS sources.  40 C.F.R. Part 60, Subpart A, §§ 60.1- 60.19 (Subpart A).

59.     The provisions of 40 C.F.R. Part 60 "apply to the owner or operator of any

stationary source which contains an affected facility, the construction or modification of which is

commenced after the publication [in Part 60] of any standard (or, if earlier, the date of

publication of any proposed standard) applicable to that facility."  40 C.F.R. § 60.1.

60.     "Affected facility" is defined as "any apparatus to which a standard is

applicable."  40 C.F.R. § 60.2.

61.     At all times, including periods of startup, shutdown, and malfunction,

owners and operators shall, to the extent practicable, maintain and operate any affected facility

including associated air pollution control equipment in a manner consistent with good air

pollution control practice for minimizing emissions.  40 C.F.R. § 60.11(d).

### C.   Title V

62.     Title V of the CAA, 42 U.S.C. §§ 7661-7661f, establishes an operating

permit program for certain air pollution sources, including "major sources."  The purpose of Title

V is to ensure that all "applicable requirements" for compliance with the CAA are collected in a

single, federally enforceable permit to operate the source.

63.     "Major source" under Title V includes any stationary source that is a

"major source" as defined in Section 112 of the CAA, 42 U.S.C. § 7412.

64.     Pursuant to Section 502(b) of the CAA, 42 U.S.C. § 7661a(b), EPA

promulgated regulations implementing the requirements of Title V and establishing the

minimum elements of a Title V permit program to be administered by any state or local air pollution control agency. 57 Fed. Reg. 32250 (July 21, 1992). Those regulations are codified at 40 C.F.R. Part 70.

65.     Section 502(a) of the CAA, 42 U.S.C. § 7661a(a), and the implementing regulation at 40 C.F.R. § 70.7(b), make it unlawful for any person to violate any requirement of a permit issued under Title V or to operate a major source except in compliance with a permit issued by a permitting authority under Title V.

66.     EPA granted interim approval of the New Jersey Title V operating program plan, effective June 17, 1996 (61 Fed. Reg. 24715 (May 16, 1996)), and granted full approval, effective November 30, 2001 (66 Fed. Reg. 63169 (December 5, 2001)).

67.     40 C.F.R. § 70.6(b)(1) specifies that all terms and conditions in a permit issued under a Part 70 program, including any provisions designed to limit a source's potential to emit, are enforceable by the Administrator of EPA under the CAA.

### D.     Enforcement of the CAA

68.     Section 113(a)(3) of the CAA, 42 U.S.C. § 7413(a)(3), authorizes EPA to bring a civil action if the Administrator finds that any person is in violation of any regulation promulgated or permit issued under Sections 111 or 112 of the CAA, 42 U.S.C. §§ 7411 and 7412, or any regulation promulgated or permit issued under Title V of the CAA, 42 U.S.C. §§ 7661-7661f.

69.     Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes the Court to enjoin a violation, to require compliance, to assess and recover a civil penalty, and to award any other appropriate relief for each violation.

70.    Section 113(b) of the CAA, 42 U.S.C. § 7413(b), authorizes civil penalties of up to $25,000 per day for each violation of the CAA.  The Debt Collection Improvement Act, 31 U.S.C. § 3701 *et seq.*, requires EPA to periodically adjust its civil penalties for inflation.  On December 31, 1996, February 13, 2004, and December 11, 2008, EPA adopted and revised regulations entitled "Adjustment of Civil Monetary Penalties for Inflation," 40 C.F.R. Part 19, to upwardly adjust the maximum civil penalty under the CAA.  For each violation that occurs between January 31, 1997, and March 15, 2004, inclusive, penalties of up to $27,500 per day may be assessed; for each violation that occurs between March 16, 2004, and January 12, 2009, inclusive, penalties of up to $32,500 per day may be assessed; for each violation that occurs between January 13, 2009, and November 2, 2015, inclusive, penalties of up to $37,500 per day may be assessed.

## ALLEGATIONS

### A. General Allegations

71.    PRC owns and operates a petroleum refinery, i.e., the Facility, at 800 Billingsport Road, Paulsboro, New Jersey.

72.    The Facility includes equipment assembled and connected by pipes or ducts to process raw and/or intermediate materials, and to refine and manufacture petroleum products, including transportation fuels, heating fuels, or lubricants, among other things.

73.    The Facility consists of buildings, structures or installations that emit, or have the potential to emit, 10 tons per year or more of any HAP or 25 tons per year or more of any combination of HAPs.

74.    The Facility has petroleum refining process units and equipment which include gas streams that are continuously or periodically emitted during normal operations, and

that contain total organic HAP concentrations greater than or equal to 20 parts per million by volume, and total volatile organic compound emissions greater than or equal to 33 kilograms per day, at the outlet of the final recovery device, prior to any control device and prior to discharge to the atmosphere.

75.     The Facility's petroleum refining process units and equipment include emissions of organic HAPs from pumps, compressors, pressure relief devices, sampling connection systems, open-ended valves or lines, valves, or instrumentation systems. These process units and equipment either contain or contact fluid (liquid or gas) that is at least 5 percent by weight of total organic HAPs.

76.     The Facility includes a south flare system, comprised of the old south flare and the new south flare, and a north flare system (collectively, the Facility Flares). The Facility Flares are used to control vent gas from Facility process units. The south flare system can be arranged to allow for either flare to serve as the primary flare, with the second flare serving as a back-up. Flow to the south flare system may trigger flaring at either or both flares, depending on the total load to the system.

77.     The Facility Flares are steam-assisted, and steam flow to each flare is controlled manually. Steam is added in proportion to the amount of vent gas. This practice is intended to enhance combustion and prevent the formation of smoke at the flares. The amount of steam is measured as a ratio of the mass of steam per unit mass of vent gas (lb/lb).

78.     The north flare has a steam flow meter that measures steam in pounds per hour. The old and new south flares have no steam flow meters. Instead, the steam flow rates for the old and new south flares are estimated from the open position of the steam valves.

79.     On February 18, 2010, EPA initiated a compliance evaluation of the Facility, which included a physical inspection of the Facility Flares and associated equipment and control stations, and a review of records pertaining to the Facility Flares.

80.     Information/documentation regarding operation of the Facility Flares, including flare data logs for known flaring events (Flare Data) which have occurred since February 2006, were obtained by EPA during the inspection and through PRC's responses to an EPA information request.

81.     The Flare Data for each flaring event includes the dates and duration of each known flaring event, the average mass flow-rate of vent gas (in pounds per hour), the average steam flow-rate (in pounds per hour), steam-to-vent gas ratios, the average net heating values of the vent gas (in Btu/standard cubic foot), and the composition of the vent gas.

82.     Excessive steam-to-vent gas ratios caused steam quenching of the flame, resulting in lower combustion efficiency, lower destruction efficiency, and increased preventable, excess emissions.

83.     Excessive steam-to-vent gas ratios are not good air pollution control practices for minimizing emissions.

84.     Operation of a flare with low combustion and destruction efficiencies indicates that flare emissions are not being minimized consistent with good air pollution control practices for minimizing emissions.

85.     The Flare Data indicates that at least 41 times between December 2006 and July 2012, PRC operated the new south flare with an excessive steam-to-vent gas ratio, causing excess HAP and VOC emissions. As such, it operated the Facility Flares in a manner inconsistent with good air pollution control practices to minimize emissions.

86.     The Flare Data indicates that at least 3 times between December 2006 and July 2012, PRC operated the old south flare with an excessive steam-to-vent gas ratio, causing excess HAP and VOC emissions.  As such, it operated the Facility Flares in a manner inconsistent with good air pollution control practices to minimize emissions.

87.     The Flare Data indicates that at least 108 times between February 2006 and July 2012, PRC operated the north flare with an excessive steam-to-vent gas ratio, causing excess HAP and VOC emissions.  As such, it operated the Facility Flares in a manner inconsistent with good air pollution control practices to minimize emissions.

### B. NESHAPS Allegations

88.     PRC is the "owner or operator," as defined in Section 112(a)(9) of the CAA, 42 U.S.C. § 7412(a)(9), and 40 C.F.R. 63.2, of the Facility.

89.     The Facility includes a building, structure, or installation which emits or may emit any air pollutant.

90.     The Facility is a "stationary source" within the meaning of Section 112(a)(3) of the CAA, 42 U.S.C. § 7412(a)(3), and 40 C.F.R. § 63.2.

91.     The Facility is a "major source" within the meaning of Section 112(a)(1) of the CAA, 42. U.S.C. § 7612(a)(1).

92.     The Facility is an "existing source" within the meaning of 42 C.F.R. § 63.2.

93.     The Facility includes a "petroleum refining process unit" within the meaning of 40 C.F.R. § 63.641.

94.     The Facility is a "plant site" within the meaning of 40 C.F.R. § 63.461.

95.    The Facility emits, or has equipment containing or contacting, one or more HAPs listed in Table 1 of the Refinery MACT, including but not limited to carbon disulfide, hexane, benzene, and methyl tertiary butyl ether.

96.    The Facility has "emission points," including flares, which are "affected sources," all within the meaning of 40 C.F.R. § 63.641.

97.    The Facility's petroleum refining process unit and equipment include gas streams that are continuously or periodically emitted during normal operations, and that contain total organic HAP concentrations of greater than or equal to 20 parts per million by volume, and total volatile organic compound emissions of greater than or equal to 33 kilograms per day, at the outlet of the final recovery device, prior to any control device and prior to discharge to the atmosphere.

98.    At all relevant times, the Facility and Facility Flares are or were subject to the MACT General Provisions at 40 C.F.R. §§ 63.6(e)(1)(i) and 63.11(b)(1), and the Refinery MACT, including the duty to operate the Facility and Facility Flares in a manner consistent with good air pollution control practices to minimize emissions.

99.    At all relevant times, the Facility and Facility Flares are or were also subject to NSPS Subpart VV, and as such, its owner or operator is or was required to monitor its flares to ensure they are operated and maintained in conformance with their design pursuant to 40 C.F.R. §§ 60.18(d) and 60.482.10(e).

## C. NSPS Allegations

100.    PRC is an "owner or operator," within the meaning of 40 C.F.R.

§ 60.2.

101.    The Facility is a "new source" within the meaning of 42 U.S.C. §

7411(a)(2) because it was constructed/modified after the publication of the NSPS regulations at

40 C.F.R. Part 60, Subpart J, §§ 60.100 et seq.

102.    The Facility is a "stationary source" within the meaning of

Section 111(a)(3) of the CAA, 42 U.S.C. § 7411(a)(3).

103.    The Facility is a "petroleum refinery" within the meaning of 40 C.F.R. §

60.101(a).

104.    The Facility is subject to 40 C.F.R. Part 60, Subpart J, §§ 60.100 et seq.

105.    The three flares at the Facility are "affected sources" within the meaning

of 40 C.F.R. § 60.2, and therefore, subject to 40 C.F.R. Subpart A, §§ 60.1 – 60.19.

106.    As such, at all relevant times, the owner or operator of the Facility/Facility

Flares are/were required to operate the flares consistent with good air pollution control practices

to minimize emissions pursuant to 40 C.F.R. § 60.11(d).

## D. Title V General Allegations

107.    On February 11, 2002, the New Jersey Department of Environmental

Protection (NJDEP) issued the Title V Operating Permit for the Facility.  The Operating Permit

has been amended/renewed from time to time since then.

108.    Operating Permit Reference # 3 for the old south flare requires that the

flare shall be operated in accordance with specifications provided by the manufacturer, citing

N.J.A.C 7:27-16.13(a).

109. Operating Permit Reference # 19 for the old south flare requires that any affected facility, which includes the old south flare, be operated with good air pollution control practices, citing 40 C.F.R. § 60.11(d).

110. Operating Permit Reference # 25 for the old south flare requires that the flare be monitored to ensure that it is operated and maintained in conformance with its design, citing 40 C.F.R. § 60.18(d).

111. Operating Permit Reference # 3 for the new south flare requires that the flare shall be operated in accordance with specifications provided by the manufacturer, citing N.J.A.C 7:27-16.13(a).

112. Operating Permit Reference # 19 for the new south flare requires that any affected facility, which includes the old south flare, be operated with good air pollution control practices, citing 40 C.F.R. § 60.11(d).

113. Operating Permit Reference # 26 for the old south flare requires that the flare be monitored to ensure that it is operated and maintained in conformance with its design, citing 40 C.F.R. § 60.18(d).

114. Operating Permit Reference # 3 for the north flare requires that the flare shall be operated in accordance with specifications provided by the manufacturer, citing N.J.A.C 7:27-16.13(a).

## FIRST CLAIM FOR RELIEF

### *NESHAPs*

115. Plaintiff realleges and incorporates Paragraphs 1 through 114 as if fully set forth herein.

116.    At all relevant times, the Facility/Facility Flares are/were subject to 40 C.F.R. § 63.6(e)(1)(i), including the requirement that they be operated in a manner consistent with good air pollution control practices for minimizing emissions.

117.    On numerous occasions beginning in February 2006, PRC violated the Act by failing to operate the Facility/Facility Flares in a manner consistent with good air pollution control practices to minimize emissions.

118.    As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the violations set forth above subject PRC to injunctive relief and civil penalties of up to $32,500 per day per violation between March 16, 2004, and January 12, 2009; and up to $37,500 per day per violation between January 13, 2009 and November 2, 2015.

## SECOND CLAIM FOR RELIEF

### *NSPS*

119.    Plaintiff realleges and incorporates Paragraphs 1 through 118 as if fully set forth herein.

120.    At all times relevant, the Facility/Facility Flares are/were subject to 40 C.F.R. § 60.11(d), including the requirement that they be operated in a manner consistent with good air pollution control practices for minimizing emissions.

121.    On numerous occasions beginning in February 2006, PRC violated the Act by failing to operate the Facility/Facility Flares in a manner consistent with good air pollution control practices to minimize emissions.

122.    As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the violations set forth

above subject PRC to injunctive relief and civil penalties of up to $32,500 per day per violation between March 16, 2004, and January 12, 2009; and up to $37,500 per day per violation between January 13, 2009 and November 2, 2015.

## THIRD CLAIM FOR RELIEF

### *Title V*

123.   Plaintiff realleges and incorporates Paragraphs 1 through 122 as if fully set forth herein.

124.   Pursuant to the Operating Permit, the Facility Flares were to be operated in accordance with the manufacturer's specifications and at all times using good air pollution control practices to minimize emissions.

125.   On numerous occasions beginning in February 2006, PRC violated the Operating Permit, and the Act, by failing to operate the Facility Flares in accordance with specifications provided by the manufacturer and/or failing to use good air pollution control practices to minimize emissions.

126.   As provided in Section 113(b) of the CAA, 42 U.S.C. § 7413(b), and pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the violations set forth above subject PRC to injunctive relief and civil penalties of up to $32,500 per day per violation between March 16, 2004, and January 12, 2009; and up to $37,500 per day per violation between January 13, 2009 and November 2, 2015.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the United States of America, prays that this Court:

1.   Permanently enjoin PRC from operating its Facility except in accordance with the CAA, applicable regulatory requirements, and its Title V Operating Permit.

2.    Assess a civil penalty against PRC of up to $32,500 for each violation occurring between March 16, 2004, and January 12, 2009; and up to $37,500 per day for each violation occurring between January 13, 2009 and November 2, 2015; and,

3.    Grant such other relief as the Court deems just and proper.

Respectfully submitted,

ELLEN MAHAN
Deputy Chief
Environmental Enforcement Section
United States Department of Justice

/s/
BRIAN G. DONOHUE
Senior Attorney
PATRICK BRYAN
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
202-514-5413
brian.donohue@usdoj.gov

WILLIAM E. FITZPATRICK
Acting United States Attorney
District of New Jersey

/s/
Allan Urgent
Assistant United States Attorney
970 Broad Street, 7th Floor
Newark, NJ 07102
973-297-2079
allan.urgent@usdoj.gov

OF COUNSEL:

ERICK R. IHLENBURG
Assistant Regional Counsel
Office of Regional Counsel, Air Branch
U.S. Environmental Protection Agency, Region 2
290 Broadway
New York, New York 10007-1866